**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01460-NYW-GPG

MATTHEW IMUS, individually and as co-personal representative of the Estate of Connor Imus, and
EMILY IMUS, individually and as co-personal representative of the Estate of Connor Imus,

     Plaintiffs,

v.

THE UNCOMPAHGRE VALLEY WATER USERS ASSOCIATION, and
UNITED STATES OF AMERICA,

     Defendants.

---

**MEMORANDUM OPINION AND ORDER**

---

This matter is before the Court on Defendant the United States of America's Motion to Dismiss ("Motion to Dismiss" or "Motion"). [Doc. 20, filed August 8, 2022]. The Court concludes that oral argument would not materially assist in the resolution of this matter. Accordingly, upon careful review of the Motion and corresponding briefing, the entire case file, and the applicable case law, the Court respectfully **GRANTS** the Motion to Dismiss for the reasons stated herein.

**BACKGROUND**

**I.    Factual Background**

The following facts are drawn from the Complaint, [Doc. 3 at 4–18], unless otherwise indicated, and are taken as true for the purposes of the instant Motion. This action arises from the death of Connor Imus, the son of Plaintiffs Matthew Imus and Emily Imus ("Plaintiffs"), who died after drowning in a canal on land known as the "Uncompahgre Project" (or the "Project") located

in Montrose, Colorado (the "Property"). [*Id.* at ¶¶ 4–7, 25, 41]. The Project was a joint venture between Defendants the Uncompahgre Valley Water Users Association ("UVWUA" or the "Association"), a non-profit association, and the United States of America ("United States"), acting through the Bureau of Reclamation in the United States Department of the Interior ("BOR"). [*Id.* at ¶¶ 10, 12–13]. Specifically, the United States worked with the UVWUA to construct the Uncompahgre Project—an irrigation project to divert the Gunnison River "into a network of canals and laterals" that includes "128 miles of major canals, 438 miles of laterals[,] and 216 miles of drains." [*Id.* at ¶¶ 24, 25].

Plaintiffs allege that the area of the canal around the Property "is very deceptive and very dangerous" because although "on the surface it appears to be slow[-]moving and shallow, it is in fact very fast-moving with a powerful undercurrent and undertow." [*Id.* at ¶ 43]. Plaintiffs also allege that there were no signs posted on the Property "warning of the dangers of the canal and its undercurrent" or "warn[ing] individuals that the Property was private land"; and "no gate, chain, or rope marking off the Property or canal." [*Id.* at ¶¶ 45–47]. In addition, "it was only after Connor Imus's unfortunate drowning that the UVWUA or the [United States] placed warning signs in the area." [*Id.*]. Plaintiffs further allege that another individual drowned in the canal in 2010, and "[h]is body was recovered near Uncompahgre Road, south of where Connor Imus's body was found." [*Id.* at ¶ 44].

Plaintiffs sue the UVWUA and the United States for negligence and claims under the Colorado Premises Liability Act. [*Id.* at 9–16]. With respect to the United States, Plaintiffs allege, *inter alia*, that the United States (1) "was legally responsible for the condition of the Property and for the activities conducted or circumstances existing on the premises of the Property"; (2) "had a duty to warn the public of all dangerous conditions of which it was aware or should have been

aware"; and (3) "knew or should have known that the presence of the canal constituted a danger to the public" and "that the presence of the canal constituted a dangerous condition." [*Id.* at ¶¶ 103, 107, 109–10]; *see also* [*id.* at ¶¶ 95–96, 116, 120–23, 131–32]. Plaintiffs seek economic and noneconomic damages, as well as litigation costs. [*Id.* at 17–18].

***Contracts Governing the Project.*** The United States and the UVWUA entered into 10 contracts to complete the Project, "all of which provided for the construction of the Uncompahgre Project, including the payment of the cost thereof and/or the performance of acts and things connected with said project." [*Id.* at ¶ 26]. These 10 contracts, which were entered between 1904 and 1940, were ultimately superseded by a 1948 contract between the United States and UVWUA ("1948 Contract"), and the 1948 Contract remains in effect. [*Id.* at ¶¶ 26–30; Doc. 20-1 at ¶¶ 4–6]; *see also* [Doc. 20-2 (the 1948 Contract)].[1]

Among its many provisions, the 1948 Contract provides that the UVWUA has the primary right to use the water rights acquired as part of the Uncompahgre Project as necessary to irrigate the land specified in the agreement. [Doc. 20-2 at 14, ¶ 15.a.].[2] The United States, on the other hand, retains the right to use water from the Uncompahgre Project "for its own sole benefit" so long as it does not substantially interfere with the Association's primary use rights. [*Id.* at 15, ¶ 15.b.]. Notably, the UVWUA is designated as the sole entity "to care for, operate, and maintain" the Uncompahgre Project "without cost or expense to the United States." [*Id.* at 18, ¶ 18]. The

---

[1] The 1948 Contract was amended one time in 1948 to "conform . . . to sections 203 through 230 of the Reclamation Reform Act of 1982." [Doc. 20-3 at 2]; *see also* [Doc. 20-1 at ¶ 7]. However, the amendment only applied to two articles of the 1948 Contract that are not pertinent to the instant Motion, and "[a]ll other contract provisions [were] in no way or manner . . . affected by th[e] amendment." [Doc. 20-3 at 2].

[2] When citing to the 1948 Contract, the Court will refer to the page numbers generated by the CM/ECF system in the top right corner of each page, as well as the paragraph numbers of the relevant contract provisions.

Contract also contains a hold harmless clause, stating that UVWUA agrees to hold the United States "harmless as to any and all damage which may in any manner grow out of the care, operation and maintenance" of the Uncompahgre Project area.  [*Id.* at 27, ¶ 27].

## II.    Procedural Background

Plaintiffs initiated this action in the District Court for Montrose County, Colorado on May 4, 2021, against only UVWUA.  *See* [Doc. 1-3 at 2; Doc. 3 at 19–20].[3]  On April 19, 2022, Plaintiffs filed the operative Complaint, bringing a total of eight counts, four of which are directed against the United States:  (1) Negligence Resulting in Wrongful Death and Survivor Claim pursuant to Colo. Rev. Stat. §§ 13-21-202, 13-21-101 against UVWUA ("Count I"); (2) Premises Liability to Invitee Resulting in Wrongful Death and Survivor Claim pursuant to Colo. Rev. Stat. § 13-21-115 against UVWUA ("Count II"); (3) Premises Liability to Licensee Resulting in Wrongful Death and Survivor Claim pursuant to Colo. Rev. Stat. § 13-21-115 against UVWUA ("Count III"); Premises Liability to Tresspassee [sic] Resulting in Wrongful Death and Survivor Claim pursuant to Colo. Rev. Stat. § 13-21-115 against UVWUA ("Count IV"); (5) Negligence Resulting in Wrongful Death and Survivor Claim pursuant to Colo. Rev. Stat. §§ 13-21-202, 13-21-101 against the United States ("Count V"); (6) Premises Liability to Invitee Resulting in Wrongful Death and Survivor Claim pursuant to Colo. Rev. Stat. § 13-21-115 against the United States ("Count VI"); (7) Premises Liability to Licensee Resulting in Wrongful Death and Survivor

---

[3] While the United States avers in its Notice of Removal that Plaintiffs filed suit against UVWUA on November 11, 2019, [Doc. 1 at ¶ 1], the docket indicates that the case was initiated on May 4, 2021, [Doc. 1-3 at 2].  The United States identifies no other case number, and this Court takes judicial notice of the records of the District Court of Montrose County, Colorado that indicates that Plaintiffs filed this action originally on May 4, 2021.  [*Id.*; Ex. 1]; *see also* Fed. R. Evid. 201; *St. Louis Baptist Temple v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir.1979) ("[I]t has been held that federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

Claim pursuant to Colo. Rev. Stat. § 13-21-115 against the United States ("Count VII"); and (8) Premises Liability to Tresspassee [sic] Resulting in Wrongful Death and Survivor Claim pursuant to Colo. Rev. Stat. § 13-21-115 against the United States  ("Count VIII").  [Doc. 3].  Plaintiffs invoke the Federal Tort Claims Act ("FTCA") with respect to their claims against the United States.  [*Id.* at ¶ 16].

The UVWUA answered on May 3, 2022.  [Doc. 4].   On June 9, 2022, the United States removed this action to the United States District Court for the District of Colorado pursuant to the FTCA, 28 U.S.C. §§ 2671–80, and 28 U.S.C. § 1346(b).[4]  [Doc. 1 at ¶¶ 5–6].  On August 8, 2022, the United States filed the instant Motion to Dismiss, seeking dismissal of Plaintiffs' claims against it for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  [Doc. 20].  Plaintiffs responded to the Motion on September 6, 2022, [Doc. 27], and the United States replied on September 20, 2022, [Doc. 28].  The Motion to Dismiss is thus ripe for disposition.

## LEGAL STANDARDS

### I.   Federal Rule of Civil Procedure 12(b)(1)

Federal courts are ones of limited jurisdiction; "[t]hey possess only that power authorized by Constitution and statute . . . which is not to be expanded by judicial decree."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).  Federal Rule of Civil Procedure 12(b)(1) provides that a complaint may be dismissed for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  "Dismissal under Rule 12(b)(1) is not a judgment on the merits of the plaintiff's claim.  Instead, it is a determination that the court lacks authority to

---

[4] In the Complaint, Plaintiffs aver that "[b]ecause this is an action now brought under the Federal Tort Claims Act, the US District Court for the District of Colorado has original jurisdiction over this action" and "[t]he venue of this action is proper in the US District Court for the District of Colorado."  [Doc. 3 at ¶¶ 16, 21].  Nevertheless, Plaintiffs filed the Complaint in the District Court for Montrose County, Colorado.  [Doc. 3 at 4].

adjudicate the matter." *Creek Red Nation, LLC v. Jeffco Midget Football Assn., Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016) (citing *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994)). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 945 F.3d 1270, 1273 (10th Cir. 2019) (quoting *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017)).

Challenges to subject matter jurisdiction may take two different forms—a facial attack or a factual attack—which implicate different analytical frameworks. First, in a facial challenge, the focus is on the sufficiency of the allegations in the complaint. *See United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). In resolving a facial challenge, "the district court must accept the allegations in the complaint as true." *Id.* Second, "a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter depends." *Id.* In addressing a factual challenge to subject matter jurisdiction, "the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* (citation and quotations omitted). In such an instance, "a court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion." *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). The party invoking federal jurisdiction has the burden of establishing said jurisdiction. *Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005).

In support of its Rule 12(b)(1) Motion to Dismiss, the United States asserts that it is raising a factual challenge to subject matter jurisdiction, [Doc. 20 at 5], and it supplements the allegations in the Complaint by presenting three documents: (1) the Declaration of Ed Warner ("Mr. Warner"),

the Area Manager of the Western Colorado Office for the BOR; (2) a copy of the 1948 Contract

between the United States and UVWUA; and (3) a 1984 amendment to the 1948 Contract ("1948

Amendment"). [Doc. 20-1 to Doc. 20-3]. Plaintiffs do not dispute the form or substance of any

of those documents. *See generally* [Doc. 27]. The Court thus finds that the United States has

properly raised a factual attack, and will consider those documents accordingly.

## II.     The Federal Tort Claims Act

Generally, the United States is immune from suit pursuant to the doctrine of sovereign

immunity, which precludes federal jurisdiction. *See United States v. Mitchell*, 463 U.S. 206, 212

(1983) ("It is axiomatic that the United States may not be sued without its consent and that the

existence of consent is a prerequisite for jurisdiction."). But, "[t]hrough 28 U.S.C. § 1346(b)(1),

the FTCA waives sovereign immunity for certain state law tort claims against the United States."

*Garling v. EPA*, 849 F.3d 1289, 1294 (10th Cir. 2017). More specifically, the FTCA operates to

waive sovereign immunity "with respect to certain injuries caused by government employees

acting within the scope of their employment." *Tippett v. United States*, 108 F.3d 1194, 1196 (10th

Cir. 1997). Under the FTCA, the United States may be sued

> for money damages . . . for injury or loss or property, or personal injury or death
> caused by the negligent or wrongful act or omission of *any employee of the
> Government* while acting within the scope of his office or employment, *under
> circumstances where the United States, if a private person, would be liable to the
> claimant in accordance with the law of the place where the act or omission
> occurred.*

28 U.S.C. § 1346(b)(1) (emphasis added). "Put another way, the FTCA incorporates the

substantive law of the state where the tortious act or omission occurred." *Augutis v. United States*,

732 F.3d 749, 752 (7th Cir. 2013) (citation and quotation omitted); *see also Feres v. United States*,

340 U.S. 135, 142 (1950) (the FTCA "recognizes and assimilates into federal law the rules of

substantive law of the several states . . ."). "[A] waiver of the Government's sovereign immunity

will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996).

Several exceptions exist, however, to the waiver of sovereign immunity under the FTCA. *See Garling*, 849 F.3d at 1294 (citing 28 U.S.C. § 2680(a)–(n)). "When an exception applies sovereign immunity remains, and federal courts lack jurisdiction." *Id.* Two such exceptions are relevant here. Under the first, known as the independent contractor exception, the FTCA defines an "employee" of the Government as including officers and employees of a "federal agency" and then specifically excludes from the definition of federal agency "any contractor within the United States." 28 U.S.C. § 2671. As a result, "[t]he FTCA does not authorize suits based on the acts of independent contractors or their employees." *Curry v. United States*, 97 F.3d 412, 414 (10th Cir. 1996). The second exception, known as the discretionary function exception, provides that the FTCA's waiver of sovereign immunity does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If either of these exceptions is applicable, it serves to bar a plaintiff's claim against the Government. *See Tsosie v. United States*, 452 F.3d 1161, 1163 (10th Cir. 2006) (independent contractor exception); *Smith v. United States*, 546 F.2d 872, 875–76 (10th Cir. 1976) (discretionary function exception).

### III.   Conversion of a Rule 12 Motion to a Rule 56 Motion for Summary Judgment

Relevant here, if the resolution of the jurisdictional question is "intertwined" with the merits of the case, a court must convert the Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or Rule 56 summary judgment motion. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (citing *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987)). "The

jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case." *Id.*; *see also Paper, Allied-Indus., Chem. and Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005). For instance, the Tenth Circuit has stated that "the determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues." *Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir. 1991); *see also Garcia v. United States Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008) (treating motion to dismiss involving discretionary function exception as summary judgment motion where jurisdictional question was intertwined with merits of case). However, when the resolution of the jurisdictional issue is not intertwined with the substantive claims in the case, reference to such evidence outside the pleadings does not convert the Rule 12(b)(1) motion to one for summary judgment under Rule 56. *See Holt*, 46 F.3d at 1003 ("Here, resolution of the jurisdictional issue . . . does not depend on the FTCA which provides the substantive claims in the case. Thus, the district court properly treated the government's motion as one brought pursuant to Rule 12(b)(1).").

Here, the United States argues that the Court need not convert the Motion to Dismiss to a Rule 56 summary judgment motion because the jurisdictional issues are not "intertwined with the merits of the case," and there are no material facts in dispute. [Doc. 20 at 5]. Plaintiffs do not address the conversion issue in their Response and, as noted above, they do not dispute the factual assertions in the documents the United States submitted in support of its 12(b)(1) factual challenge. *See* [Doc. 27]. Accordingly, the Court finds that it may rule on the Motion to Dismiss without converting it to a summary judgment motion. Indeed, from the Parties' briefs, it is clear the facts related to the independent contractor and discretionary function exceptions—particularly the

statements in Mr. Warner's Declaration and the terms of the 1948 Contract—are not in dispute. *Compare* [Doc. 20-1; Doc. 20-2] *with* [Doc. 27 at 3–4]; *see also Clark v. United States*, 695 F. App'x 378, 382 n.2 (10th Cir. 2017) (finding conversion improper where, *inter alia*, the Parties failed to "point to specific disputes of material fact involving merits issues that require resolution under a summary-judgment analysis"); *Lopez v. United States*, 376 F.3d 1055, 1061 (10th Cir. 2004) (finding conversion unwarranted where "[t]he specific facts alleged to be in dispute by the plaintiffs . . . immaterial to the applicability of the discretionary function exception"); *Myles v. United States*, 52 F. App'x 108, 109 (10th Cir. 2002) (finding conversion unwarranted where "the pertinent jurisdictional facts are undisputed").

## ANALYSIS

The United States moves to dismiss Plaintiffs' claims against it (Counts V–VIII) based on two separate exceptions in the FTCA: the independent contractor exception and the discretionary function exception. *See* [Doc. 20]. The Court will address each exception in turn.

## I. Does the Independent Contractor Exception Apply?

### A. Consideration of Factors

As mentioned above, under the FTCA, the United States can be held liable for the actions of "*any employee of the Government while acting within the scope of his office or employment,* under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added). "Although 'employees' of the government include officers and employees of federal agencies, 'independent contractors' are not 'employees.'" *Tsosie*, 452 F.3d at 1163 (citing *Curry*, 97 F.3d at 414). In other words, "the [G]overnment can[not] be liable under the FTCA for the negligence of its independent contractors." *Ohlsen v. United States*, 998 F.3d 1143, 1154 (10th Cir. 2021).

The Tenth Circuit has held that "[i]n determining whether an individual is a federal employee or an independent contractor, the critical question is whether the federal government has the power to control the detailed physical performance of the individual." *Duplan v. Harper*, 188 F.3d 1195, 1200 (10th Cir. 1999). Under this control test, "the key inquiry" is "'whether the Government supervises the day-to-day operations of the individual.'" *Id.* (citing *Lilly v. Fieldstone*, 876 F.2d 857, 858 (10th Cir. 1989)). The Court's answer to this question involves consideration of a number of factors, which include:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses his own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

*Tsosie*, 452 F.3d at 1163–64.

The United States analyzes each of the above factors in its opening brief, arguing that all weigh in favor of finding that the UVWUA was and is an independent contractor. *See* [Doc. 20 at 8–12]. In their Response, Plaintiffs implicitly concede that UVWUA is an independent contractor of the United States. In fact, they acknowledge that "the United States cannot be held vicariously liable for the [UVWUA's] conduct." [Doc. 27 at 6 ("While the United States cannot be held vicariously liable for the Association's conduct, it can be held liable for its own failures.")]; *see also* [*id.* at 10 ("Clearly the United States cannot be held vicariously liable for the Association's failure.")]. Nevertheless, considering the above factors, as well as the relevant case law, this Court concludes that the UVWUA is an independent contractor of the United States. *See* [Doc. 20 at 7–12 (the Government's analysis of the seven factors)].

***Intent of the Parties.*** With respect to the first factor, the intent of the United States and the UVWUA to establish an independent contractor relationship is plain from their 1948 Contract.

As the United States points out in its opening brief, the contract clearly delineates the roles and responsibilities of the UVWUA.  [Doc. 20 at 8].  For instance, the 1948 Contract provides that the Association has the "perpetual primary right" to use the water rights acquired as part of the Uncompahgre Project, whereas the United States retains a secondary right to use water so long as its use is "without substantial interference with the Association's primary right to the use of the [P]roject works and water supply" under the contract.  [Doc. 20-2 at 14–15, ¶ 15].  The contract also provides that the UVWUA shall "care for, operate and maintain" the Uncompahgre Project, and "said care, operation, maintenance, and control of the works by the Association *shall be without cost or expense*" to the United States.  [*Id.* at 18, ¶ 18 (emphasis added)].  In addition, the UVWUA, "during any and all times it is operating and maintaining the [P]roject, agrees to perform . . . all obligations imposed upon the United States in all project contracts of whatever kind or nature."  [*Id.* at 18–19, ¶ 19].  The contract further states that the UVWUA agrees to hold the United States "harmless as to any and all damage which may in any manner grow out of the care, operation and maintenance" of the Uncompahgre Project area.  [*Id.* at 27, ¶ 27].  Moreover, the 1984 Amendment expressly refers to the UVWUA as "the Contractor."  [Doc. 20-3 at 2].

*United States's Control.*  Turning to the second factor, the United States's ability to control the manner and method of the UVWUA's performance, the contract contains an "Inspection of Works and Records" provision, which states:

> The Secretary may, from time to time, make, or cause to be made, an inspection of the project works for the purpose of ascertaining whether the terms of this contract are being carried out by the Association.  Such inspection shall include examination of the works and of the books, records, and papers of the Association, together with examinations in the office of the Bureau of Reclamation of all contracts, papers, plans, records, and programs connected with said works.  The actual costs . . . of such inspection shall be paid by the Association to the United States.

[Doc. 20-2 at 27, ¶ 28].  This language weighs in favor of independent contractor status.  As the United States correctly notes, such right of inspection "is not enough to make UVWUA an

12

employee as opposed to an independent contractor." [Doc. 20 at 12 n.3]. Indeed, the Tenth Circuit has observed that "it is only if the employer retains the right to direct the manner of the independent contractor's performance, or assumes affirmative duties with respect to safety, [that] the employer has retained sufficient control to be held liable if he exercises that control negligently." *Bowman v. United States*, 65 F.3d 856, 859 (10th Cir. 1995); *see also Flynn v. United States*, 631 F.2d 678, 680 (10th Cir. 1980) ("The general right to inspect and make safety requirements is not enough."). Plaintiffs also do not claim that the United States has any right to control the manner or method of the UVWUA's performance. *See* [Doc. 3; Doc. 27]. Accordingly, the Court finds that this second factor weighs in favor of the United States. *See Curry*, 97 F.3d at 415 (finding independent contractor status where the United States Forest Service "monitored [the individual's] activities to the extent necessary to ensure that the desired results were achieved, but it otherwise gave [the individual]" discretion in choosing how to perform the contract").

*Use of Equipment.* As to the third factor—i.e., whether the UVWUA uses its own equipment or that of the United States—the Court finds that the language in the 1948 Contract requiring the UVWUA "to care for, operate and maintain" the Uncompahgre Project "without cost or expense" to the United States, [Doc. 20-2 at 18, ¶ 18], tips this factor in favor of a finding of independent contractor status.

*Liability Insurance.* With respect to the fourth factor, who provides liability insurance, although the 1948 Contract does not contain a provision requiring the United States to maintain insurance for the UVWUA, the contract's hold harmless clause states that the Association "shall hold the United States, its officers, employees, and agents harmless as to any and all damage which may *in any manner* grow out of the care, operation and maintenance of the transferred works by the association." [Doc. 20-2 at 27, ¶ 27 (emphasis added)]. This factor thus also weighs in favor

of finding an independent contractor relationship.  *See Borquez v. United States*, 773 F.2d 1050, 1051 (9th Cir. 1985) (finding that the Government validly transferred "any ultimate duties over care, operation and maintenance" of an irrigation project where the Government "obtained hold-harmless agreements from the Association").

  ***Social Security Tax.***  Turning to the fifth factor, Mr. Warner has averred that the "BOR and/or the United States does not pay social security tax for UVWUA employees."  [Doc. 20-1 at ¶ 9].  Again, Plaintiffs do not dispute any of the statements in Mr. Warner's Declaration. Accordingly, this factor supports an independent contractor relationship.

  ***Federal Regulations and the Authority to Subcontract.***  The last two factors also point to independent contractor status.  Plaintiffs have pointed to no regulations prohibiting federal employees from performing contracts like the 1948 Contract, *see generally* [Doc. 27], and the contract provides that the UVWUA may enter contracts "in connection with ordinary operation and maintenance of the [P]roject."  [Doc. 20-2 at 20, ¶ 19].

### B. Application of *Borquez*

  The United States cites the Ninth Circuit's decision in *Borquez v. United States* as "particularly instructive here."  [*Id.* at 12].  The Court agrees.  In that case, the BOR and the Salt River Valley Water Users Association ("SRVWUA") entered into a contract for the construction of a large irrigation project, which included a diversion dam as a component of the project. *Borquez*, 773 F.2d at 1051.  Under the contract, the SRVWUA agreed to assume "the care, operation and maintenance of the project" and to "hold the United States harmless from any damages to property arising out of the care, operation and maintenance of the project."  *Id.*  That contract also "allowed the United States certain inspection rights and provided for termination upon notice by either the United States or the [SRVWUA]."  *Id.*  After two individuals drowned

at the diversion dam, the plaintiffs sued the United States under the FTCA for, *inter alia*, negligent care, operation, and maintenance of the project, and "failure to warn of the dangerous nature of the project." *Id.* The Ninth Circuit found that the Government "validly transferred operation, care and maintenance" of the project and, therefore, was "not liable for any acts or omissions of the [SRVWUA]." *Id.* at 1052–53. The court noted that (1) the contract at issue "did not reserve to the [G]overnment any ultimate duties over care, operation and maintenance" of the project, (2) the contract "granted the United States no more than the right to inspect the project and terminate the agreements," which were still in effect at the time, and (3) the United States "obtained hold-harmless agreements from the [SRVWUA]." *Id.* at 1052. In addition, it was irrelevant, for purposes of determining employee status, that the United States owned the land under and surrounding the diversion dam. *Id.* at 1053.

Similarly, here, the United States has executed a valid transfer of the operation, care, and maintenance of the Uncompahgre Project to the Association, and Plaintiffs agree that the BOR "primarily relies upon [the Association] to determine whether to install warning signs or other related measures." [Doc. 27 at 4 (citation omitted)]. Plaintiffs also allege the following in the Complaint:

- the United States "worked with the UVWUA to construct the" Uncompahgre Project;

- the United States "was legally responsible for the condition of the Property and for the activities conducted or circumstances existing on the premises of the Property";

- the United States "had a duty to warn the public of all dangerous conditions of which it was aware or should have been aware"; and

- the United States "knew or should have known that the presence of the canal constituted a danger to the public" and "that the presence of the canal constituted a dangerous condition."

[Doc. 3 at ¶¶ 25, 103, 107, 109–10]; *see also* [*id.* at ¶¶ 95–96, 116, 121–23, 131–32]. The facts of this case are thus analogous to *Borquez*, where the plaintiffs alleged that the United States "was liable for (1) the construction of the dam with a defective design; (2) the negligent care, operation, and maintenance of the facility; and (3) the failure to warn of the dangerous nature of the project." *Borquez*, 773 F.2d at 1051.

Plaintiffs attempt to distinguish *Borquez* because the injury at issue in that case arose in Arizona, and "there was no non-delegable duty at issue under Arizona law" in that case. [Doc. 27 at 9]. However, as the Government correctly points out, whether there was a non-delegable duty of care under Arizona law in *Borquez* "was not relevant to the Ninth Circuit's decision of whether the United States, pursuant to the relevant contract, had delegated the duty to control, operate, care, and maintain the property at issue, including the duty to warn or safeguard against allegedly dangerous conditions." [Doc. 28 at 6]. Significantly, and contrary to Plaintiffs' argument here, the *Borquez* court expressly did "not reach the question of whether, absent the bar imposed by 28 U.S.C. § 2680(a), the government would have had any duty under Arizona law as a landowner or builder either to maintain the premises in a safe condition or to warn of a dangerous condition." *Borquez*, 773 F.2d at 1052 n.2.

### C.     Does the United States Maintain Any Non-Delegable Duties?

The *Borquez* court stated that "[b]ecause liability for properly delegated duties is forbidden under the Tort Claims Act, any tort liability of the United States must reside in some non-delegable duty under Arizona law." *Borquez,* 773 F.2d at 1053. Relatedly, Plaintiffs contend that "most of the United States' arguments about whether the [UVWUA] is a contractor" are irrelevant because "[a]s a landowner, the United States owes non-delegable duties to entrants upon the land and can be held responsible for its own failure to fulfill those duties." [Doc. 27 at 6].

***The Colorado Premises Liability Act cannot abrogate the independent contractor exception.*** In making this argument, Plaintiffs rely upon the Colorado Premises Liability Act ("CPLA"), noting that the CPLA "retains the doctrine of nondelegation" and "[a] landowner who retains possession of the property cannot delegate the duty to maintain it in a safe condition to an independent contractor." [*Id.* at 6–7 (citing *Kidwell v. K-Mart Corp.*, 942 P.2d 1280, 1282 (Colo. App. 1996))].

Respectfully, the Court finds Plaintiffs' arguments unpersuasive. As an initial matter, and as the United States points out in its Reply, another court in this District previously rejected the same nondelegation argument that Plaintiffs submit here. [Doc. 28 at 3]. In *Nelson v. United States* ("*Nelson I*"), following a biking accident on land owned by the United States Air Force Academy (or the "Academy"), the plaintiffs sued the United States under the CPLA, asserting that the United States "owed a non-delegable duty to [the victim] . . . to protect him from dangerous conditions of which it knew or should have known on Academy property." No. 11-cv-02953-WYD-MEH, 2013 WL 5214697, at *1 (D. Colo. Sept. 16, 2013). The United States sought summary judgment against the plaintiffs on three grounds, including that "a contractor was responsible for maintenance and repair of all pavements on Academy property," thus invoking the independent contractor exception to the FTCA. *Id.* Although the Court found that "summary judgment should be denied as to the argument that the independent contractor exception to FTCA liability applie[d] for two reasons" that are not present here,[5] the Court rejected the plaintiffs'

---

[5] Those two reasons were the existence of genuine issues of material fact as to whether (1) "the contractor at issue . . . actually was hired or responsible for maintenance of the asphalt path at issue" and (2) "the Academy [was] liable for its own actions or omissions in connection with the path." *Nelson I*, 2013 WL 5214697, at *8. As discussed throughout this Order, Plaintiffs concede that the United States has delegated to the UVWUA the authority to make decisions regarding the placement of warning signs. *See* [Doc. 27 at 4; Doc. 20-1 at ¶ 12].

"argument that the United States' duty as a landowner is nondelegable." *Nelson I*, 2013 WL 5214697, at *9.  The Court first noted that, indeed, under Colorado law, "a landowner may not delegate to an independent contractor the obligation to exercise reasonable care to protect invitees against dangers within the scope of the" CPLA.  *Id.* (first citing *Pierson v. Black Canyon Aggregates, Inc.,* 48 P.3d 1215, 1220 (Colo. 2002); and then *Jules v. Embassy Props., Inc.,* 905 P.2d 13, 15 (Colo. App. 1995)).  The Court explained, however, that "the Supreme Court has held that Congress'[s] intent in passing the FTCA makes clear that *the courts cannot use state tort law to abrogate the independent contractor exception*."  *Id.* (emphasis added) (first citing *Logue v. United States*, 412 U.S. 521, 528 (1973); and then *Lurch v. United States,* 719 F.2d 333, 338 (10th Cir. 1983)).  "Thus, substantive tort law, such as from state law or the Restatement, even where it imposes a non-delegable duty . . . , does not generally abrogate the independent contractor exception."  *Id.*

The principles cited by the court in rejecting the plaintiffs' nondelegation argument in *Nelson I* apply equally to Plaintiffs' argument here that the United States's duty of care as an owner of the Property at issue in this case is nondelegable.  Indeed, Plaintiffs rely upon the CPLA, a state law, in arguing that the nondelegation doctrine applies to their claims against the United States.  *See* [Doc. 27 at 6–7].  However, as the Supreme Court explained:

> Congress, of course, could have left the determination as to whose negligence the Government should be liable for under the Federal Tort Claims Act to the law of the State involved, as it did with other aspects of liability under the Act.  But it chose not to do this, and instead incorporated into the definitions of the Act the exemption from liability for injury caused by employees of a contractor.  While this congressional choice leaves the courts free to look to the law of torts and agency to define 'contractor,' it does not leave them free to abrogate the exemption that the Act provides.

*Logue*, 412 U.S. at 528; *accord Lurch,* 719 F.2d at 338 ("Congress did not leave the independent contractor exemption subject to the vagaries of state law departures from the exemption and the

courts are not 'free to abrogate the exemption that the Act provides.'"); *see also Nelson I*, 2013 WL 5214697, at *9 (citing *Logue* and *Lurch*); *Sydnes v. United States*, 523 F.3d 1179, 1184 (10th Cir. 2008) ("But we reach the question whether the federal government is liable for breaching some duty of care under state law if (and only if) we can first find an applicable waiver of sovereign immunity by the federal government itself."). This Court is bound by the decisions of the Supreme Court and the Tenth Circuit, both of which have determined that state law does not abrogate the independent contractor exception to liability under the FTCA. *See Logue*, 412 U.S. at 528; *Lurch,* 719 F.2d at 338; *see also Alinsky v. United States*, 415 F.3d 639, 645 (7th Cir. 2005) ("Congress did not simultaneously adopt the various state exceptions to the independent contractor rule. Rather, Congress expressly granted jurisdiction for suits brought against the United States for its employees' conduct, and not the conduct of contractors. State common law principles cannot overcome this federal statute." (citation omitted)) (collecting cases); *Roditis v. United States*, 122 F.3d 108, 111 (2d Cir. 1997) ("Even assuming such a nondelegable duty exists, plaintiffs nonetheless are foreclosed under the FTCA from a recovery based on such a duty.").

Moreover, Plaintiffs fail to cite any authority that merits a different conclusion on this issue. Instead, they rely upon two cases that are inapplicable to the facts of this case. *See* [Doc. 27 at 8–10]. First, Plaintiffs cite *Thorne v. United States*, 479 F.2d 804, 808 (9th Cir. 1973). [*Id.* at 8]. There, the plaintiff was an employee of a company which had contracted with the United States "to construct a spillway as part of [a] dam" in California. *Thorne*, 479 F.2d at 805. The employee was injured while digging in a trench when a large rock "broke loose on the upper side of the trench" and "slid downhill across the trench" and struck him. *Id.* In finding that the United States could be held liable for the employee's injuries under the FTCA, the court "recognize[d] that [California] courts have followed the proposition that one who employs an independent

contractor is, as a general rule, not liable for the misconduct of the latter or his servants while acting within the scope of the contract." *Id.* at 808.  However, the court explained that "there are certain clear[-]cut exceptions which, with increasing tendency, seem[ed] to overshadow in importance and scope the rule itself." *Id.*  In that case, the clear-cut exception was "the duty imposed on an employer of an independent contractor for the misconduct of the latter in *the performance of certain 'intrinsically dangerous' work*." *Id.* (emphasis added).  The court acknowledged that "generally speaking, the mere reservation of a right to inspect work performed by an independent contractor, including the right to stop the work if precautions are not taken, does not impose upon the government any duty of inspection or control." *Id.* at 809.  But it emphasized that "this rule does not apply to a factual background . . . where the work is *extra-dangerous*." *Id.*

A similar issue arose in *Rooney v. United States*, 634 F.2d 1238, 1244 (9th Cir. 1980)—the second case Plaintiffs cite in support of their argument.  [Doc. 27 at 8–9].  There, an employee of a United States contractor was assigned to perform some paint work at an elevated height, and was injured when he failed to tie into the safety line, then slipped and fell 40 feet.  *Rooney*, 634 F.2d at 1240.  In concluding that the United States was liable for the employee's injuries, the Ninth Circuit, again analyzing California law, explained that California "impos[es] a nondelegable duty of due care on the employer of an independent contractor *where the work to be performed involves special dangers*." *Id.* at 144 (emphasis added).

Here, Plaintiffs acknowledge that both *Thorne* and *Rooney* involved California's nondelegable duty of care on the employer of a contractor where the work involves dangerous conditions.  *See* [Doc. 27 at 8–9].  It is clear that this case does not involve the same factual circumstances at all, including injury to an employee of a contractor—there is no dispute that

Connor Imus was not an employee of UVWUA; rather, he was a private citizen walking his dog. [Doc. 3 at ¶ 32].[6]

***Shared Control.*** Plaintiffs further argue that the United States shares control of the Property with the UVWUA, reasoning that, under the 1948 Contract, the United States (1) "continues to own the land and the South Canal"; (2) "retains the right to use the land and the South Canal, along with the other works, as long as it does not interfere with the Association's use"; (3) can "resume control if the Association does not fulfill its contractual obligations"; (4) has "the right to inspect the works at the Association's expense"; (5) has "the right to direct the Association to perform maintenance and repairs"; and (6) has "the authority to take control of the works and perform maintenance if necessary." [Doc. 27 at 6–7]. Plaintiffs maintain that these rights provide "the United States sufficient control to remain liable as a landowner, even if the Association is a lessee." [*Id.* at 7].

At the outset, the Court finds that Plaintiffs' control argument is more applicable to the issue of whether UVWUA is an independent contractor of the United States. As mentioned above, however, Plaintiffs do not dispute that UVWUA is an independent contractor. Likewise, Plaintiffs

---

[6] Notably, the *Borquez* court, citing to *Thorne* and *Rooney*, acknowledged "the existence [under California law] of a non-delegable duty to exercise reasonable care in seeing that inherently dangerous work is performed in a non-negligent manner." *Borquez*, 773 F.2d at 1053 (emphasis added). The court emphasized, however, that the injuries in that case "did not arise from any special dangers inherent in the actual maintenance or operation of the dam for the purpose for which it was intended." *Id.* And the court further explained that the "inherently dangerous work" exception could not apply to the "care, maintenance, and operation of the dam" either:

> Even if the care, maintenance and operation of the dam assumed by the Association were construed to include a duty to warn the public away from the dam, such warnings, if given, would permit the dam to be operated safely. The operation of the dam cannot then be viewed as "inherently dangerous" for purposes of rendering the United States liable, because it does not involve "a risk of harm which cannot be eliminated by the exercise of reasonable care."

*Id.* (citation omitted).

expressly chose not to discuss the control test for determining an independent contractor relationship, including any of the factors the United States addressed in its opening brief. *Compare* [Doc. 20 at 7–12 (addressing each of the seven factors a court considers in evaluating "whether the Government supervises the day-to-day operations of the individual") *with* [Doc. 27 at 6 (Plaintiffs' response that "most of the United States' arguments about whether the Association is a contractor are beside the point; at best they are irrelevant, a[t] worst they are a red herring.").

In any event, Plaintiffs' control argument does not invalidate the applicability of the independent contractor exception to FTCA liability in this case. The fact that the United States owns the Property is irrelevant to UVWUA's status as an independent contractor. *See Borquez*, 773 F.2d at 1053 ("That a contracting party is maintaining property owned by the federal government is irrelevant to employee status."). And the remaining 1948 Contract provisions cited by Plaintiffs fare no better. *See, e.g.*, *Curry*, 97 F.3d at 415 (finding independent contractor even where the United States Forest Service "monitored [the contractor's] activities to the extent necessary to ensure that the desired results were achieved, but it otherwise gave [the contractor] discretion in choosing how to perform the contract"); *Bowman*, 65 F.3d at 859 (10th Cir. 1995) (finding the United States "did not retain the right to control and manage the details of [the contractor's] work performance" despite having "reserved the right to make on-site inspections to insure compliance with all the terms and provisions of the contract, and did, in fact, make such inspections"); *Borquez*, 773 F.2d at 1051–53 (finding independent contractor where, under the contract, the SRVWUA agreed to assume "the care, operation and maintenance of the project" and to "hold the United States harmless from any damages to property arising out of the care, operation and maintenance of the project," and also "allowed the United States certain inspection rights and provided for termination upon notice by either the United States or the [SRVWUA]").

Nevertheless, the Court pauses here to consider Plaintiffs' "shared control" argument, particularly as it relates to their assertion that "[a]s a landowner, the United States owes non-delegable duties to entrants upon the land and can be held responsible for its own failure to fulfill those duties." [Doc. 27 at 6]; *see also* [*id.* at 9 ("Even if it delegated this duty to the Association, the United States retained a duty to ensure proper precautions were taken with respect to entrants on the land.")]. Some courts have recognized that the independent contractor exception "has no bearing on the United States' FTCA liability for its *own* acts or omissions. *Edison v. United States*, 822 F.3d 510, 518 (9th Cir. 2016); *accord Pexton v. United States*, No. 20-cv-01071-RM-NRN, 2021 WL 5628918, at *18 (D. Colo. Feb. 19, 2021); *Prado v. Perez*, 451 F. Supp. 3d 306, 313 (S.D.N.Y. 2020). As the Ninth Circuit explained in *Edison*, "'[m]any cases recognize that it is not a defense, to liability for one's own negligence in connection with an actor whose conduct injured a third party, that the actor was not an agent or an employee,' but rather an independent contractor." *Edison*, 822 F.3d at 518 (quoting Restatement (Third) Of Agency § 7.05 (2006)). Notably, the *Edison* court also stated that:

> [A] determination that the United States has declined to exercise control over the day-to-day operations of its contractor is not the end of the analysis. We must also determine *whether Plaintiffs have alleged a separate nondelegable or undelegated duty, which the United States could be held directly liable for breaching*. Only upon a finding that the government delegated its *entire* duty of care may the court dismiss the claim for lack of jurisdiction under the FTCA's independent contractor exception.

*Id.* (first emphasis added).[7]

---

[7] Similarly, the Tenth Circuit has recognized a "retained control" exception, under which the hirer of the independent contractor is liable only where the hirer has "retained some degree of control over the manner in which the work is to be done" to preclude the contractor from performing the work in its own way. *Flynn*, 631 F.2d at 680.

Here, Plaintiffs contend that the independent contractor exception does not bar their claims against the United States based on a theory that (1) the United States has retained some control over the management of the Property and, therefore, (2) it can be liable for failing to warn of the dangers with respect to the canal.  *See* [Doc. 27 at 6–7].  This argument fails for one obvious reason: Plaintiffs expressly concede that the BOR "*primarily relies upon [the Association] to determine whether to install warning signs or other related measures, and does not generally make determinations as to whether to install such mitigation measures*."  [Doc. 27 at 4 (emphasis added) (quoting [Doc. 20-1 at ¶ 12])].  In other words, Plaintiffs do not dispute that the United States has delegated its duty of care to the UVWUA with respect to the placement of warning signs.  *See Edison*, 822 F.3d at 518 ("Only upon a finding that the government delegated its *entire* duty of care may the court dismiss the claim for lack of jurisdiction under the FTCA's independent contractor exception."); *cf. Keyes v. United States*, No. 18-cv-01469-JLK, 2018 WL 11190661, at *3 (D. Colo. Dec. 6, 2018) (finding that the independent contractor exception did not apply where the plaintiff alleged that the United States Marshals Service and its employees "were negligent in performing the duties they owed to him *apart from those delegated* to [a contractor], namely the duty to approve/provide timely and adequate nonemergent, offsite medical treatment" (emphasis added)).

Under these circumstances, Plaintiffs have failed to establish that the independent contractor exception does not apply to bar FTCA liability against the United States.

## II.      The Discretionary Function Exception

Even if the independent contractor exception to the FTCA did not apply, the Court also concludes that dismissal is appropriate based on the independent, alternative reason that the discretionary function exception applies to the facts of this case.  *See* [Doc. 20 at 13].  The

discretionary function exception to FTCA liability "marks the boundary between Congress'[s] willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (internal quotation marks and citation omitted). Claims that fall within the exception are barred regardless of whether the challenged conduct "was a matter of deliberate choice or mere oversight," *Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir. 1993), and even if there was actionable negligence, *see Elder v. United States*, 312 F.3d 1172, 1184 (10th Cir. 2002). Whether the exception applies depends on the nature of the agency's conduct. *See United States v. Gaubert*, 499 U.S. 315, 322 (1991).

To determine whether the agency's conduct falls within the discretionary function exception, courts apply a two-part test as set forth in *Berkovitz v. United States,* 486 U.S. 531 (1988). *See Garcia*, 533 F.3d at 1176. First, a court considers whether the conduct at issue was "discretionary"—that is, "whether the action is a matter of choice for the acting employee.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536). If "the challenged conduct 'involves an element of judgment or choice,' . . . it is discretionary and falls within the language of the exception." *Ball v. United States*, 967 F.3d 1072, 1076 (10th Cir. 2020) (quoting *Kiehn*, 984 F.2d at 1102). By contrast, if the conduct "involves a federal statute, regulation, or policy that specifically prescribes a course of action for an employee to follow," then "the exception does not apply." *Id.* (quotations omitted). A plaintiff bears the burden to "present evidence of a discretion-restraining regulation or policy." *Sydnes*, 523 F.3d at 1185.

Second, to the extent a court has determined that the challenged conduct was discretionary, a court next considers whether it required the "exercise of judgment based on considerations of public policy." *Garcia*, 533 F.3d at 1176. In particular, discretionary decisions "grounded in the

social, economic, or political goals" are protected, and a complaint must be dismissed unless a plaintiff "allege[s] facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 323–25. "When established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.*; *see also Kiehn*, 984 F.2d at 1105 (stating courts "will not assume a nonpolicy decision unless the record shows something to the contrary"). The focus of the inquiry into the second *Berkovitz* factor "is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Ball*, 967 F.3d at 1076; *Sydnes*, 523 F.3d at 1185 (explaining that, instead of "ask[ing] whether policy analysis is the *actual* reason for the decision in question," a court analyzes "categorically (rather than case specifically) whether the kind of conduct at issue can be based on policy concerns" (emphasis in original) (internal citations omitted)). If both elements are met, the governmental conduct is protected as a discretionary function, and sovereign immunity bars a claim that involves such conduct. *Garcia*, 533 F.3d at 1176. In other words, "if a plaintiff can establish that either element is not met, the plaintiff may proceed because the exception does not apply." *Id.*

In order to apply this framework, the Court first pauses to consider the specific conduct Plaintiffs challenge. Although Plaintiffs acknowledge that the UVWUA has, since 1932, operated and maintained the project, "including maintaining all of the canals," [Doc. 3 at ¶ 31], they contend that the United States nevertheless has a duty to place warning signs on the Property regarding the canal at issue in this case because such action "involve[s] garden-variety housekeeping and a routine safeguard, not a decision grounded in a policy of the [BOR]." [Doc. 27 at 12, 18].

Plaintiffs' Complaint thus identifies the challenged conduct as (1) "a duty to exercise reasonable care to protect against dangers of which [the United States] actually knew or as a reasonable person exercising reasonable care should have known"; and (2) "a duty to warn the public of all dangerous conditions of which [the United States] was aware or should have been aware." [Doc. 3 at ¶¶ 106–07]. According to Plaintiffs, these purported duties are based solely upon the United States's status as a "landowner" of the Property. [*Id.* at ¶¶ 102, 115, 120, 127, 130]. The Court will now address each prong of the *Berkovitz* test in turn.

### A. *Berkovitz* Prong One: Whether the Challenged Conduct is Discretionary.

To begin, the Court asks whether any statute, regulation, or policy required the United States to take any of the precautions suggested by Plaintiffs. *See Kiehn*, 984 F.2d at 1102. "If such an obligation existed, there would be no discretion for the exception (to the waiver of sovereign immunity) to protect." *Ball*, 967 F.3d at 1077. At this step, Plaintiffs bear the burden to "present evidence of a discretion-constraining regulation or policy" that applies to the alleged conduct. *Sydnes*, 523 F.3d at 1185.

Plaintiffs' Complaint fails to identify any discretion-constraining law, regulation, or policy regarding the BOR's placement of warning signs on the Property. *See* [Doc. 3]. And, despite Plaintiffs' acknowledgment of the two-part test under *Berkovitz*, *see* [Doc. 27 at 11], they omit any discussion of the first prong of the test in their Response altogether, choosing instead to discuss only the second. *See* [*id.* at 10–18]. Accordingly, the first prong of the *Berkovitz* test is met here.

### B. *Berkovitz* Prong Two: Whether the Challenged Conduct is Susceptible to Policy Analysis.

Because Plaintiffs have failed to show that a specific policy, statute, or regulation required the United States to take the actions suggested by Plaintiffs—i.e., place warning signs on the Property, *see* [Doc. 27 at 17–18]—the Court advances to the second *Berkovitz* factor. At this step,

the Court asks whether decisions regarding the placement of warning signs are the types of actions that the discretionary function was designed to shield. *See Sydnes*, 523 F.3d at 1185.  Discretionary actions that Congress intended to shield are those governmental decisions "'based on considerations of public policy'—decisions 'grounded in social, economic, and political policy.'" *Johnson v. United States Dep't of Interior*, 949 F.2d 332, 336 (10th Cir. 1991) (quoting *Berkovitz*, 486 U.S. at 536–37) (internal quotations omitted).  The discretionary function exception is thus "designed to protect policymaking by the executive and legislative branches of government from judicial second-guessing." *Garcia*, 533 F.3d at 1176.  When no statute, regulation, or policy sets forth a required course of action, the Court must "*presume* that a government agency's actions are grounded in policy" unless the challenger shows facts to the contrary.  *Ball*, 967 F.3d at 1079.

Plaintiffs may overcome the discretionary function exception by showing "that the nature of the actions taken does not implicate public policy concerns, or [is not] susceptible to policy analysis." *Sydnes*, 523 F.3d at 1185 (citation and internal quotations omitted).  The existence of a regulation that allows a government employee discretion "creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert*, 499 U.S. at 324.  "[T]he complaint must be dismissed unless it 'allege[s] facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.'" *Ball*, 967 F.3d at 1076.

The Court presumes that the BOR's decision-making was policy-based "unless Plaintiffs direct [the Court] to facts to the contrary." *Id.* at 1079.  Plaintiffs have not done so.  Instead, Plaintiffs counter that the BOR's decision to rely upon the UVWUA as to the placement of warning signs is "garden-variety housekeeping and a routine safeguard" that is "not a decision grounded in

a policy of the Bureau." [Doc. 27 at 12]. This Court is respectfully not persuaded by Plaintiffs' unsupported conclusion.

In its opening brief, the United States contends that "in order to determine whether and how to use safety and other warning signs at a myriad of diverse project areas, [the] BOR must balance public-policy considerations such as unobtrusive roles in the day-to-day operations of its independent contractors, limited resources, scenic preservation, and public safety." [Doc. 20 at 16]. Thus, "it is inherently a policy decision by BOR whether to constrain UVWUA (or any other association or water district in the United States) on whether and how to warn or guard against allegedly dangerous conditions on property that UVWUA cares for, operates, and maintains." [*Id.*].

In *Kiehn v. United States*, the Tenth Circuit determined that the United States could not be held liable for its failure to warn rock climbers of potentially unstable climbing conditions in a remote area of a national monument. *Kiehn*, 984 F.2d at 1101, 1106. The court determined that the United States's decision not to place warning signs at the site "was a component of an overall policy decision to protect the area's natural scenery." *Id.* at 1104. Notably, the United States also "chose to have its permitted concessionaires warn employees and customers of potential hazards such as climbing rock formations," and the court determined that it was not permitted to "second-guess the [United States's] decision to play an unobtrusive role in dispensing warnings by leaving the task to its permittee." *Id.* at 1105. Here, like in *Kiehn*, the United States has chosen to have a separate entity—i.e., the UVWUA—make decisions regarding the placement of warning signs regarding the Uncompahgre Project. *See* [Doc. 20-1 at ¶ 12]. Plaintiffs do not dispute that such discretion lies with the UVWUA. *See* [Doc. 27 at 17 ("Further, [Mr. Warner's Declaration] expresses the expectation that the [UVWUA] would put up warning signs.")].

Plaintiffs' citations to other Tenth Circuit case law does not alter this Court's conclusion. For instance, Plaintiffs cite *Duke v. Department of Agriculture*, 131 F.3d 1407 (10th Cir. 1997), where the Tenth Circuit held that the discretionary function exception did not exempt the Government's decision not to warn of falling rocks at a campground in a national forest. *Duke*, 131 F.3d at 1412. In that case, the Government acknowledged that cost was not a factor in its decision, and the court could discern no public policy (such as preserving natural beauty) that was implicated by the decision not to install a warning sign at the campground. *Id.* at 1411–12. However, the camping area where the accident occurred was "jointly operated" by the United States Forest Service and State of New Mexico. *Id.* at 1410.

Plaintiffs also cite *Cope v. Scott*, 45 F.3d 445 (D.C. Cir. 1995), where the court held that the discretionary function exception did not protect the Government's decisions with respect to the placement of warning signs regarding dangerous road conditions. *Cope*, 45 F.3d at 446, 451. In that case, however, the United States Park Service was responsible for managing the property at issue. *Id.* at 446, 452 ("Here, the Park Service has chosen to manage the road in a manner more amenable to commuting through nature than communing with it.").

In addition, Plaintiffs cite *Nelson v. United States*, 20 F. Supp. 3d 1108 (D. Colo. 2014) ("*Nelson II*"), for the proposition that "a misapprehension as to who is responsible for signage is not a policy decision and does not warrant application of the [discretionary function] exception." [Doc. 27 at 18 ("The United States's statement it expected the Association to put up signs, along with its argument that it delegated its duties to the Association shows it was under the misapprehension it had not [sic] duty to put up signs. But that is incorrect.")]. However, in that case, the United States Air Force's failure to act was "based on confusion about or a misunderstanding about who was responsible for maintaining the path, and not because of any

social, economic, or policy judgment." *Nelson II*, 20 F. Supp. 3d at 1127.  And notably, "[o]ther than the United States, no person or entity claimed any . . . control over the property and path" at issue. *Id.* at 1119; *see also id.* at 1121 ("Despite considering the path closed to the public and despite considering public users of the path unauthorized or trespassers, the [United States Air Force Academy] took no action . . . to prevent the public from entering its property to use the path.").

Each of these cases is distinguishable based on the United States's role.  There is no dispute that, under the 1948 Contract, the care, operation, and maintenance of the Uncompahgre Project is solely the responsibility of the  UVWUA and such "care, operation and maintenance, and control of the works by the [UVWUA] shall be without cost or expense to the United States."  [Doc. 20-2 at 14].  Indeed, Plaintiffs allege in the Complaint that since 1932, "[t]he UVWUA has operated and maintained" the Uncompahgre Project.  [Doc. 3 at ¶ 31].  Plaintiffs do not dispute that "[b]ecause [the] UVWUA . . . operates and maintains the Uncompahgre Project area, [the] BOR primarily relies upon [the] UVWUA to determine whether to install warning signs or other related measures, and does not generally make determinations as to whether to install such mitigation measures."  [Doc. 20-1 at ¶ 12].[8]

Finally, Plaintiffs contend that the canal in this case represented "a specific hazard" about which the United States was aware, and therefore "[t]he United States had no reason not to add a sign" regarding that hazard.  [Doc. 27 at 18]; *see also* [*id.* at 17 ("[T]here was a specific, man[-]made hazard: the canal.  The canal was particular dangerous [sic] at this spot due to its deceptive speed and undercurrent. And this is shown by the prior death at the location. Nor was there a

---

[8] None of the remaining cases cited by Plaintiffs discuss the United States's delegation of certain responsibilities to contracting entities or the policy considerations implicated in such decisions. *See* [Doc. 27 at 12–17].

specific policy reason not to put up a sign.")].   This position, too, is based on an incorrect

application of the Court's inquiry under the second *Berkovitz* prong.  "Application of *Berkovitz*'s

second prong does not require proof of the thought processes of the pertinent decisionmakers."

*Elder*, 312 F.3d at 1182.  "Rather, the focus of the inquiry is more generally 'on the nature of the

actions taken and on whether they are susceptible to policy analysis.'"  *Ball*, 967 F.3d at 1079

(quoting *Gaubert*, 499 U.S. at 325).  In other words, the Court's inquiry here is whether the BOR's

decisions about warning against the dangers posed by canals and waterways—i.e., delegating such

decision-making authority to associations and water districts throughout the United States, like the

UVWUA, [Doc. 20-2 at ¶ 12]—implicate protected policy judgments.  It is not, as Plaintiffs

suggest, "whether there is evidence that the inaction specific to the [canal] . . . was grounded in

policy."  *Ball*, 967 F.3d at 1079.

  This Court "will not second-guess the [United States's] decision to play an unobtrusive

role in dispensing warnings by leaving the task to" the UVWUA.  *Kiehn*, 984 F.2d at 1105.  And

because Plaintiffs have not identified any facts to the contrary, the Court "will not assume a

nonpolicy decision" on the part of the United States.  *Id.*; *see Taylor v. United States,* 668 F. Supp.

1302, 1304 (W.D. Mo. 1987) ("[T]his is a case where an agency has made a policy judgment

regarding the degree of confidence that might reasonably be placed in those with whom it

contracts. . . .   [J]udicial intervention in this case would require the court to second-guess the

Department's decision about how best to ensure driver safety within the economic constraints

placed upon it. This kind of judicial second-guessing is what section 2680(a) was intended to

prevent."); *King v. United States Forest Service,* 647 F. Supp. 20, 21 (N.D. Cal. 1986) (holding

that it was a "policy decision [for the United States Forest Service] to leave warnings and other

public informational tasks to its permittee").

Accordingly, this Court respectfully **GRANTS** the Motion to Dismiss based on the lack of subject matter jurisdiction based on the application of the independent contractor, or in the alternative, the discretionary function, exception.

### III.   Supplemental Jurisdiction

Plaintiffs' remaining claims (Counts I–IV) are against the UVWUA and arise under state law. *See* [Doc. 3 at 9–12]. The Supreme Court and Tenth Circuit have both held that "[i]f federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'" *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). While not an ironclad rule inflexibly applied, the Tenth Circuit has stated that courts "usually should" decline to exercise jurisdiction in such circumstances. *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011). Furthermore, the Tenth Circuit has recognized that there are "reasons for a district court's deferral to a state court rather than retaining and disposing of state law claims itself," such as "judicial economy, fairness, convenience and comity." *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995). "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

After the dismissal of Plaintiffs' claims against the United States, there is no basis for federal-question jurisdiction in this case; "[u]nder those circumstances, 28 U.S.C. § 1367(c)(3) expressly permits a district court to decline to exercise supplemental jurisdiction over any remaining state-law claims." *Gaston v. Ploeger*, 297 F. App'x 738, 746 (10th Cir. 2008). Thus, in the interest of judicial economy and fairness, and to promote the notions of comity and federalism, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law

claims and will *sua sponte* remand those claims to the District Court for Montrose County, Colorado.[9]

**CONCLUSION**

For the reasons set forth above, **IT IS ORDERED** that:

(1)      The United States's Motion to Dismiss [Doc. 20] is **GRANTED**;

(2)      Plaintiffs' claims against the United States (Counts V–VIII) are **DISMISSED without prejudice** for lack of subject matter jurisdiction;

(3)      This case is **REMANDED** to the District Court for Montrose County, Colorado pursuant to 28 U.S.C. § 1367(c)(3); and

(4)      The Clerk of Court is directed to **TRANSMIT** this case to the appropriate state authority and **TERMINATE** this case.

DATED: February 14, 2023

BY THE COURT:

_____

Nina Y. Wang

United States District Judge

---

[9] *See Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1236–37 (10th Cir. 1997) (remanding state-law claim to district court to decline exercise of supplemental jurisdiction and remand claim to state court); *White v. Denny's Inc.*, 918 F. Supp. 1418, 1430 (D. Colo. 1996) (remanding state law claims to state court after dismissal of the federal claims, citing judicial economy and fairness to litigants); *Carnation Bldg. Servs., Inc. v. City and Cnty. of Denver*, No. 11-cv-00703-CMA-MEH, 2012 WL 4899032, at *1 (D. Colo. Oct. 16, 2012) ("A dismissal, as opposed to a remand, would require the parties to refile the case in state court, adding expense while unnecessarily delaying the resolution of the pending state law claim.  For these reasons, judicial economy and fairness to the litigants weigh in favor of remand over dismissal.").